# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 19, 2007 Session

## STATE OF TENNESSEE v. WILLIAM FLOYD CARTWRIGHT

### Direct Appeal from the Circuit Court for Putnam County
No. 04-0694A    Lillie Ann Sells, Judge

_____

### No. M2007-00500-CCA-R3-CD - Filed April 3, 2008
_____

A Putnam County jury convicted Appellant, William Floyd Cartwright, of first degree premeditated murder.  He was sentenced to life imprisonment with the possibility of parole.  On appeal, Appellant contends that the evidence is insufficient to sustain his conviction because the State did not prove that he acted with premeditation.  We affirm the judgment of the trial court because the evidence sufficiently supports the conviction.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Edwin G. Sadler (at trial and on appeal), and E.J. Mackie (at trial), Cookeville, Tennessee, for the Appellant, William Floyd Cartwright.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; William Gibson, District Attorney General; Anthony Craighead and David Patterson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

#### *Factual Background*

A Putnam County Grand Jury indicted Appellant for the first degree premeditated murder of the victim, Marvin Martin, Jr.  At Appellant's trial the proof showed the following:

1

The week before August 27, 2004, the victim befriended three young women, Lakeisha Darty, Sherry Rooks, and Tiffiney Reagan, who lived at 1918 North Dixie in Cookeville, Tennessee. The victim "hung out" there a few times that week, and, on August 27, 2004, he went to a liquor store in Jackson County with Reagan, who drove; Darty; and two other men, Bob Gist and Bob Heflin. On the way back to the womens' house, the victim suffered a panic attack, and the group contemplated taking him to the hospital, but the victim assured them that he was fine. The group returned to the girls' house between 9:00 p.m. and 10:30 p.m. when they began drinking. Some of the party, including Darty, went to a bar called "The Station," but others, including Rooks, Reagan, and the victim, remained at the house. Rooks went to bed shortly after the group left for The Station, at around 11:00 p.m. Reagan stayed awake for some time, during which she called Appellant, who was also at The Station, and told him that he could come to her house if he wanted. While Appellant was married at the time, the two had been engaged in an affair about a month prior to this incident. Reagan recalled that the victim remained at their house through the night and into the next morning, and he was "pretty drunk."

While Darty was at The Station, she saw Appellant, who was her cousin by marriage. They both stayed at The Station until closing, around 2:30 a.m., and then she drove back to her house a friend named Jennifer Vinson, Appellant, and Josh Cartwright, another of their cousins. When they left the bar, Appellant, who did not appear intoxicated, was upset with Cartwright for "disrespecting" their grandmother. Appellant hit him, leaving blood in Darty's car. Appellant said, in reference to disrespect of his grandmother, he never wanted to see "that" again. The group arrived at the girls' house, where Appellant continued to push Cartwright around in the yard.

When Darty arrived home, she awoke Reagan. When Reagan awoke she saw Appellant, whom she described as "very drunk," arguing with Cartwright, who had blood on his face. The victim, who was still at the girls' house, told Appellant to leave Cartwright alone. In response, Appellant hit the victim in the face, knocking the victim's glasses from his face and telling him that this was none of his business but was family business. Darty helped the victim find his glasses, and then she left to drive her friend Jennifer Vinson home.

After Darty left, Appellant received a phone call and Reagan heard him say "I'm at Tiffiney's, you need to get over here right now." Reagan then saw Appellant "just turn around and hit" the victim, who had not touched Appellant to this point. Reagan saw the two move to the side of the house, and she saw Appellant pull the victim's shirt off. She heard the victim say, "Tug,[1] that's enough, please stop, I didn't do anything." Reagan said, thereafter, she saw mostly shadows and silhouettes, and she heard someone hit the car. She next saw Appellant kicking and "stomping" on the victim in the front yard. Reagan said that, approximately three times, she

---

[1] It is clear from the record that Appellant's nickname was "Tug."

yelled "Tug, that's enough, stop," prompting Appellant to walk away briefly but return to beating the victim. Reagan never saw the victim attempt to defend himself.

At that point, Reagan went and awakened Rooks, telling her that Appellant was "beating up" the victim. When Reagan came back to the doorway of the front porch, she saw Servo standing on the porch. Appellant was still stomping on the victim's head, and the victim had his stomach down on the ground. Rooks said that she was going to call 9-1-1, and Servo and Reagan told her that "it wasn't that bad, that everything was okay." Rooks went inside the house and called Darty, telling her to get there quickly.

Appellant told Servo to come and help him, and they tried to carry the victim out of the yard. They could not and ended up dragging him by his feet, face down, toward the porch. When they placed the victim on the porch, Appellant appeared to be grabbing at the victim's clothes, perhaps in an attempt to take his shorts off. Reagan noticed that Appellant's silver Reeboks were covered in blood. Appellant then grabbed the victim's hands and dragged him into the shed. The victim was, at first, sitting in the shed, and Appellant pushed him onto his side.

Darty, who received the message to come home quickly, arrived and attempted to approach Appellant. Reagan told her to wait because they did not know what Appellant would do. Appellant left the shed and walked away, and Darty ran to the shed and pulled from it the victim. She yelled to Rooks for help because she could not find the victim's pulse. The two began performing CPR, and, after doing so Rooks felt a faint pulse. Darty called 9-1-1, but they decided to drive the victim to the hospital, so she hung up. As the women were attempting to load the victim into Reagan's SUV, Appellant, who appeared uninjured, returned and assisted them. Appellant told the girls to say that they found the victim in their yard in his present condition, and he said that they "better not say what happened." He also told Reagan not to take the victim to the hospital if he did not have a pulse. They were all scared of what he might do if they told the truth.

Shortly after taking the victim to the hospital, the girls learned that the victim died as a result of his injuries. When Reagan learned that the victim was not going to live, she called Appellant. Servo answered Appellant's phone. Reagan asked to speak to Appellant, and Servo said Appellant was sleeping. Reagan said that she told Servo that the victim was dead, and Servo said "you've got to [b]e kidding me." Reagan later spoke with Appellant and told him that she was not covering for him.

Detective Carl Sells, with the Cookeville Police Department, interviewed the women, who were not initially truthful with him about what had happened, telling him they found the victim lying in their front yard and someone must have left him there. Later, they all gave the detective full statements consistent with their trial testimony.

The morning after the beating, Rooks noticed a new dent in the driver's side right fender of her car, which had been parked near where the beating occurred. The detective attempted to obtain a sample of what appeared to be dried bodily fluid on the fender, but the test results returned inconclusive. The detective also processed the crime scene, submitting to the Tennessee Bureau of Investigations ("TBI") samples of blood that he found. The victim's blood was found on a welcome mat on the porch, in the grass in the front yard, and in two places in the shed. The victim's glasses, and a lens separated from those glasses, and the victim's shirt were found near the house.

The detective began procedures to locate and apprehend Appellant and Servo. Appellant's wife drove Appellant and Servo from Cookeville to Lebanon to the home of a friend, Frederick Lashane Garrett. Garrett, a criminal himself, testified that the men arrived at 6:00 a.m. on August 28, 2004. Appellant told Garrett that he had gotten into a fight where he punched, kicked, and slammed a guy around and said he was laughing while beating the man. Garrett did not initially think that the man Appellant said he fought was seriously injured, but he became suspicious something bad had happened when Appellant received numerous phone calls. Garrett asked if they had killed someone, and Appellant said "no" like "it was[] nothing." Garrett said he later learned that the victim died from the beating and that Appellant and Servo were wanted by police in connection with his death. Garrett said the two men left that evening after dark headed to Garrett's girlfriend's house in Nashville.

From Nashville, the men took a taxicab on August 31, 2004, to Clarksville to catch a bus at the Clarksville bus station. The taxicab driver, Harbens Singh Deol, learned from his dispatcher that the two men were murder suspects. He asked the dispatcher for directions to the Clarksville bus station so the dispatcher would know that the suspects were headed for the bus station. Deol saw a police officer in Clarksville following him, and he pulled over under the guise that he needed better directions to the bus station. The driver said the cab was soon surrounded by multiple officers, who arrested the suspects.

One of those arresting officers, Officer Coz Minetos, testified that he received a notice to be on the lookout for a white "Music City" taxicab van en route to Clarksville that contained two murder suspects. The officer saw a van matching this description, and the van contained a driver and two passengers. The driver pulled into a carwash. The officer asked the driver to take the key and exit the van, and the driver complied. Officer Minetos called for backup and arrested Appellant and Servo. In the taxicab, the officer found a black nylon bag. On Servo, the officer found a large amount of cash. The officer turned over the suspects to the Cookeville Police Department.

Richard G. Clark, a staff physician in the emergency room at Cookeville Regional Medical Center, testified that he retrieved the victim from Regan's vehicle but could not find a pulse. He immediately put the victim on a stretcher and brought him into the hospital, where the doctor and other staff began "advanced life support measures." The doctor pronounced the victim dead at 4:07 a.m. The doctor could tell from the injuries that the victim had suffered

4

some blunt trauma to the face and body, along with skin abrasions consistent with being dragged across concrete.

Dr. Feng Li, the medical examiner, testified that an external examination of the victim's body revealed he suffered injuries "all over the body." The victim had areas of abrasions, contusions, and lacerations to multiple areas of his body. The victim's skull bone was fractured, and he had orbital bruises. The victim's injuries were the result of blunt force, and a combination of these injuries resulted in his death. The doctor opined that the most severe injuries were the skull factures and hemorrhages. The victim's injuries were consistent with his head being stomped upon while he lay on the ground. The doctor said that the victim suffered "brush burns," which were consistent with the victim being dragged across concrete. The victim's blood alcohol level was between .15 and .19 and no drugs were detected in his system. On cross-examination, the doctor testified that the victim's blood alcohol level was over twice the legal driving limit in Tennessee.

Based upon this evidence, the jury convicted Appellant of first degree premeditated murder.

*Analysis*

On appeal, Appellant contends that the evidence is insufficient to sustain his conviction because the State did not prove premeditation. He asserts, "[T]he only reasonable interpretation of the witnesses' testimony is that [Appellant] acted in a rage on the morning of August 28, 2004." Appellant contends he should have, at most, been convicted of voluntary manslaughter. The State counters that the evidence of premeditation is clearly sufficient and that there was no evidence presented that this killing occurred while Appellant was in a state of passion produced by adequate provocation, as required for a voluntary manslaughter conviction.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from reweighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn.

Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Tennessee Code Annotated section 39-13-202(d) provides:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). Therefore, in order to convict Appellant of his indicted offense, the State was required to prove beyond a reasonable doubt that the defendant killed the victim with "premeditation." "[W]hether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the" commission of the crime. *State v. Billy Gene Debow, Sr.*, No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at *4 (Tenn. Crim. App., at Nashville, Aug. 2, 2000); *see also State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Some relevant factors that tend to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, calmness immediately after the killing," and evidence that the victim was retreating or attempting to escape when killed. *Davidson*, 121 S.W.3d at 614; *Bland*, 958 S.W.2d at 660; *see also State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992). "[T]he fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder." *State v. Brown*, 836 S.W.2d 530, 542 (Tenn. 1992).

Looking at the evidence in a light most favorable to the State, the evidence showed that the victim asked Appellant to stop hitting Cartwright, to which Appellant responded by hitting the victim. Appellant then received a phone call and asked the caller for assistance, apparently planning to continue this altercation. Appellant's friend Servo arrived a short time later. After this brief intermission, and in response to no apparent action by the victim, Appellant hit the victim again. The victim pleaded with Appellant to stop, telling Appellant that he had not done anything. Appellant stripped the victim of his shirt and continued to beat him mercilessly,

stomping repeatedly on his head. When Reagan yelled for Appellant to stop, he would stop, walk away for a moment, and then go back to kicking and stomping on the victim's head. Appellant, with Servo's assistance, then dragged the victim to the porch where he pulled down his shorts. He dragged him to the shed, stuffing his unconscious body into the shed and then leaving. Shortly after the beating, Appellant assisted the girls by loading the victim into the truck, but he told them to lie about what had happened and not to take the victim to the hospital if he had no pulse. The victim died of multiple blunt force trauma injuries, and he had several skull fractures and brain hemorrhages. Appellant told Mr. Garrett that he was laughing while beating the victim. Appellant left town in an apparent attempt to escape the police, who were looking for him at the time.

Whether the State established premeditation was primarily a jury question and based in this case on the credibility of the witnesses. Again, questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not an appellate court. *Morris*, 24 S.W.3d at 795. Further, calmness immediately after a crime is relevant in determining the element of premeditation. *Bland*, 958, S.W.2d at 660. Appellant was calm after the killing, having the wherewithal to hide the victim's body in the shed. He told the young women present not to take the victim to the hospital if he did not have a heartbeat, he told the women to lie if they did take the victim to the hospital, and Appellant immediately made plans to leave the city. Further, while the fact that repeated blows were inflicted on the victim is not sufficient, by itself, to establish first-degree murder, *see Brown*, 836 S.W.2d at 542, it is still a consideration. Appellant not only repeatedly hit, kicked, and stomped the victim, but he would walk away when Reagan pled for him to stop and then return to beating the victim. Appellant also retold the story of the beating to Garrett, apparently bragging about the killing, telling Garrett he was laughing as he inflicted a savage beating. The jury heard the evidence and determined that there was sufficient evidence of premeditation. Upon the evidence in the record, we determine that a rational jury could have found that Appellant was guilty of premeditated first degree murder. This issue is without merit.

Furthermore, the jury, by its verdict, rejected the contention that Appellant acted in a state of passion required for a finding of voluntary manslaughter. The jury was instructed that "premeditation" is an act done after the exercise of reflection and judgment. *See* T.C.A. § 39-13-202(d). This necessarily excludes a state of passion. This issue is without merit.

**Conclusion**

I light of the foregoing, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE

7